IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-02406-PAB-KLM

FRANKY L. SESSION,

　　Plaintiff,

v.

ROMERO, Deputy Sheriff Captain, in his individual capacity, and
JORDAN, Deputy Sheriff Sergeant, in his individual capacity,

　　Defendants.
_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____
**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

　　This matter is before the Court on Plaintiff's **Motion for Spoliation Sanctions** [#387][1] (the "Motion"). Defendants filed a Response [#418] in opposition to the Motion. The Motion has been referred to the undersigned for a recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and D.C.COLO.LCivR 72.1(c)(3). *See* [#389]. The Court has reviewed the entire case file and the applicable law and is sufficiently advised in the premises. For the reasons set forth below, the Court **RECOMMENDS** that the Motion [#387] be **GRANTED in part**.

### I. Factual Background and Procedural History

　　This case involves Plaintiff's allegations that his Fourteenth Amendment due process rights were violated when, in short, Defendants refused to permit Plaintiff to leave 23-hour

---

[1] "[#387]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Recommendation.

lockdown to reside in less restrictive housing between March 24, 2013, and December 18, 2013. *See Final Pretrial Order* [#300] at 2-3. Plaintiff frames the central factual issue in this lawsuit as "whether Defendants had a legitimate reason to keep Plaintiff in 23-hour lockdown (referred to as "Unit 4D") for eight-and-a-half-months." *Motion* [#387] at 3. While Plaintiff was in Unit 4D, Defendants, who were two of the three members of the Review Board at the Van Cise-Simonet Denver Detention Center ("DDC"), interviewed Plaintiff every week and made a written decision about why he was being kept in segregation. *See Ex. 1* [#387] at 35. These written decisions were supposed to be kept both in hard copy and electronically. *See id.* Plaintiff asserts that "[t]he Review Board's weekly interviews and decisions are clearly relevant to this lawsuit as they should provide contemporaneous evidence of the reason Defendants stated for keeping Plaintiff in Unit 4D." *Motion* [#387] at 3-4. A record for only a single week (May 31, 2013) has been produced by Defendants.[2] *Pl.'s Ex 6* [#388-5].

Plaintiff filed this lawsuit on August 28, 2014. *See Compl.* [#1]. Plaintiff provides evidence that "Defendants admit that the Review Board records for Plaintiff existed and were within their control after this lawsuit was filed." *Motion* [#387] at 4. Defendant Jordan was a Sergeant in the DDC's Special Management Unit (which includes Unit 4D) until August 2015 and has been a Captain in the DDC's Central Records Unit from August 2015 to present. *Pl.'s Ex. 2* [#388-1] at 23, 26. In his deposition taken November 27, 2018, he testified that in August 2015, when he left DDC's Special Management Unit, Plaintiff's Review Board records still existed but at some unknown time after that they were lost or

---

[2] Plaintiff asserts that even this one record was incomplete, but his evidentiary citation does not clearly support that statement. *See Motion* [#387] at 7 (citing *Pl.'s Ex 2* [#388-1] at 160:13-25).

destroyed.  *Id.* at 97, 109.  In July 2017 he looked for the records but was unable to find them.  *Id.* at 98.

From 2014 to June 2017, Defendant Romero was a watch commander in the DDC and the Captain overseeing the Special Management Unit.  *Pl.'s Ex. 3* [#388-2] at 11-12.  In his deposition taken November 28, 2018, Defendant Romero testified that the Review Board compiled weekly notes of its decisions, that those notes were kept in the sergeant's office, and that he himself saw those notes in the sergeant's office in 2013.  *Id.* at 155-58.  He further testified that, despite the DDC requirement that the Review Board's written decisions be kept in the jail management system as well as in hard copy, the Review Board's decisions were not kept in the jail management system.  *Id.* at 99-100.[3]

## II.  Analysis

Plaintiff argues that the evidence demonstrates three crucial points.  *Motion* [#387] at 9.  First, "Defendants lost or destroyed the Review Board's 2013 records relating to Plaintiff after this lawsuit was filed."  *Id.*  Second, "Plaintiff has been prejudiced because he cannot use the Review Board's records to refute Defendants' testimony and show that Defendants kept Plaintiff in 23-hour-lockdown without a legitimate reason and as punishment."  *Id.*  Third, "Defendants acted with bad faith by intentionally not preserving the Review Board records, trying to cover up their existence, seeking to dismiss Plaintiff's

---

[3] The third member of the Review Board, who is not a party to this lawsuit, testified that at some point she shredded her notes from the administrative review board meetings with Plaintiff.  *Pl.'s Ex. 4* [#388-3] at 40.  She testified that she typically kept her personal notes for only a few months.  *Id.*  The Court observes that the evidence therefore shows that (1) she likely shredded her last relevant notes many months before Plaintiff filed this lawsuit in August 2014, and (2) Plaintiff has not directed the Court's attention to evidence demonstrating any requirement that Review Board members keep their notes, but rather simply that "[p]roper documentation of the board's decisions for each inmate . . . be maintained . . . ."  *See Pl.'s Ex. 1* [#387-1] at 35.

claims on the basis of the Review Board meetings without revealing that the Review Board records had been lost or destroyed, and violating DDC policies and procedures." *Id.* As a result, Plaintiff seeks a jury instruction at trial "that Defendants have lost or destroyed weekly Review Board records that contained information about the reasons Plaintiff was kept in Unit 4D between March 24, 2013 and December 18, 2013, and the jury should infer that the missing records contained evidence unfavorable to Defendants and favorable for Plaintiff." *Id.* at 14.

"Destruction of evidence, or spoliation, is a discovery offense . . . ." *Gates Rubber Co. v. Bando Chem. Indus. Ltd.,* 167 F.R.D. 90, 101 (D. Colo. 1996). To ensure that discovery as permitted under the Federal Rules of Civil Procedure is not rendered futile, "litigants have a duty to preserve documents that may be relevant to pending or imminent litigation." *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.,* 244 F.R.D. 614, 620 (D. Colo. 2007). The Court may impose sanctions for destruction or loss of evidence. *Id.* "A spoliation sanction is proper where (1) a party has a duty to preserve evidence because [he] knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of evidence." *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007) (citing *103 Investors I, L.P. v. Square D Co.,* 470 F.3d 985, 989 (10th Cir. 2006)). The movant has the burden of proving, by a preponderance of the evidence, that the opposing party failed to preserve evidence or destroyed it. *In re Krause*, 367 B.R. 740, 764 (D. Kan. 2007).

**A.     Duty to Preserve Relevant Evidence**

A court may find that spoliation has occurred when a party either negligently or intentionally fails to produce relevant evidence in litigation. The failure may, of course,

occur because evidence has been destroyed or lost. *Turner v. Pub. Serv. Co.*, 563 F.3d 1136, 1149 (10th Cir. 2009). Plaintiff has the burden of proving that relevant evidence has been lost or destroyed by Defendants. *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1251 (10th Cir. 2010). Defendants do not assert that the Review Board records are irrelevant. *See generally Response* [#418]. They also do not contest that these records have been "misplaced," although they do dispute whether they personally bear any responsibility for the misplacement. *Compare id.* at 6 *with id.* at 14 n.6.

    A party is under a duty to preserve evidence when litigation is imminent. *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 620 (D. Colo. 2007). Here, the evidence demonstrates that the relevant Review Board records existed in August 2015, a year after Plaintiff filed this lawsuit. *Pl.'s Ex. 2* [#388-1] at 97, 109. Thus, the Court finds that Defendants had a clear duty to preserve the relevant Review Board records at whatever time they were lost or destroyed because litigation had already commenced. In the absence of an adequate explanation or substantial substitute evidence, a party's inability to locate relevant evidence may be construed as spoliation. *See, e.g.*, *Lutalo v. Nat'l R.R. Passenger Corp.*, No. 11-cv-00974-REB-KLM, 2013 WL 1294125, at *5 (D. Colo. Mar. 28, 2013) (holding that the plaintiff's loss of cell phone was spoliation justifying imposition of sanctions); *Novick v. AXA Network, LLC*, No. 07-CV-7767(AKH)(KNF), 2014 WL 5364100, at *6 (S.D.N.Y. Oct. 22, 2014) (finding that the defendants spoliated audio tapes when they failed to provide any explanation for why or how the tapes came to be missing); *Victor v. Lawler*, Civil No. 3:08-cv-1374, 2012 WL 1642603, at *5 (M.D. Pa. May 10, 2012) (finding that inability to recover certain evidence was not spoliation in light of reasonable explanations for inability to recover it and existence of other substantial

evidence); *Pub. Serv. Mut. Ins. Co. v. Empire Comfort Sys., Inc.*, 573 F. Supp. 2d 372, 382 n.13 (D. Mass. 2008) (granting summary judgment and holding that inability of the plaintiff to find heater which was the subject of breach of warranty claim was spoliation); *Puerto Rico Telephone Co., Inc. v. San Juan Cable LLC*, Civil No. 11-2315(GAG/BJM), 2013 WL 5533711, at *1 (D.P.R. Oct. 7, 2013) (finding that the defendant's failure to preserve, locate and produce emails was spoliation). Plaintiff has therefore sustained his burden of showing that relevant evidence was lost and/or destroyed.

B.     **Prejudice Resulting From Destruction of Relevant Evidence**

"The burden is on the aggrieved party to establish a reasonable possibility, based on concrete evidence rather than a fertile imagination, that access to the lost material would have produced evidence favorable to his cause." *Gates Rubber Co.,* 167 F.R.D. at 104. The degree of prejudice suffered by a party who experiences spoliation is generally measured in terms of how the unavailability of the spoliated evidence affects proof of the party's claim or claims. *See, e.g., Lutalo,* 2013 WL 1294125, at *4.

In short, Plaintiff argues that he "has been prejudiced because he cannot use the Review Board's records to refute Defendants' testimony and show that Defendants kept Plaintiff in 23-hour-lockdown without a legitimate reason and as punishment." *Motion* [#387] at 9; *see also id.* at 10-12. Specifically, Plaintiff argues:

> Here, Plaintiff will be prejudiced by not being able to use the missing records. The few 2013 records produced to date contradict Defendants' story, including the May 31, 2013 Review Board record produced . . . , as well as other documents from 2013 which expressly state that Plaintiff wanted to return to Unit 4A. Deposition testimony provides further support that the missing records would contradict Defendants' current story. Defendant Romero testified that his Review Board notes would document Plaintiff's refusal to return to Unit 4A. Yet Dr. Gafford testified that Plaintiff did not refuse to return to Unit 4A prior to September. And Defendant Jordan

testified he knew Plaintiff wanted to return to Unit 4A "as of April 4, 2013." In light of the testimony and the documents from 2013 that have been produced, there is more than a "reasonable possibility" that the missing records would be helpful to Plaintiff's case.

Moreover, Plaintiff is unfairly limited in how he can refute Defendants' recollection of events by not being able to compare Defendants' current testimony to their contemporaneous notes. This puts Plaintiff in a difficult position, as he is forced to rely in large part on his word against the word of a Denver Sheriff Department Captain and Sergeant. Indeed, Defendants themselves admit that the missing records would provide important evidence that could be consequential to Plaintiff's case.

*Motion* [#387] at 11 (internal citations omitted).

For their part, Defendants contend:

Plaintiff's theory that the Board's 2013 Packets would contain evidence favorable to his claims is speculative and insufficient to warrant a spoliation sanction, let alone an adverse inference jury instruction. Again, Plaintiff alleges that Defendants during their weekly Board rounds ignored him and would walk past his cell "really fast." Plaintiff repeatedly testified that there were only three times between March 24, 2013, and December 18, 2013, in which the Board stopped at his cell and conversed with him. Plaintiff claimed that other than those three times, Defendants walked past him and did not answer his questions. Plaintiff testified that he could not hear Defendants through his closed cell door as they allegedly walked by and does not know if they could hear him.

Plaintiff fails to explain how the Board's notes in the misplaced 2013 Packets would be favorable to his case. On the contrary, the Packets would contain documentation of the Board's visits to the inmates listed on the Excel spreadsheets, including Plaintiff. Such notes would not only contradict Plaintiff's testimony, but also support Defendants' assertion that they met with him practically every week. Defendant Jordan testified that the Board spoke with Plaintiff "very frequently" when he was in 4D, and that "every time" the Board spoke with him, he refused to return to 4A. Romero testified that every time he participated in the Board's weekly rounds, he recalls meeting with Plaintiff. Plaintiff fails to explain how the Board's handwritten notes documenting its weekly rounds with all inmates in special management would likely be favorable to his case.

In addition, Plaintiff's argument that the May 2013 Board record supports his claim of prejudice fails because it relies on incomplete information. The very same information that Plaintiff claims is critical in that record exists in other available documents. Specifically, Plaintiff contends that the May 2013

-7-

> record "does not support Defendants' claim, as it does not state that Plaintiff refused to return to Unit 4A, and instead lists the code for 'OSO' or 'other sexual offense,' which supports Plaintiff's claim that he was punished for fighting his charges." Plaintiff neglects to mention, however, that the native Excel spreadsheets for 2013 contain the very same alert codes as would be reflected in the misplaced paper documents. The availability of this information on the native spreadsheets forecloses Plaintiff from claiming prejudice from the absence of the printed versions of those same documents.
> . . .
>
> . . . Further, for a time period in 2014 when Plaintiff returned to special management, the Board's Packets show that they merely consisted of a cover page summarizing the number of inmates the Board saw that week; the questions that the classification deputy asked every inmate that week; tier sheets with the deputy's notes of the inmates' answers to each question; and the Board's notes on each inmate reflecting whether he would remain or leave segregation. The 2014 documents, like the May 2013 document, are consistent with Defendants' testimony and simply stated "remain" or "refer to" another housing unit, or documented an alert code change. Plaintiff's assertion that the Board's notes from 2013 would "supposedly state[] the reason Plaintiff was held in 23-hour lockdown for approximately eight-and-a-half months" is speculative and inconsistent with the evidence. Further, while Plaintiff also contends that he is "unfairly limited in how he can refute Defendants' recollection of events by not being able to compare Defendants' current testimony to their contemporaneous notes," he provides no support for his position. This case turns on the parties' different explanations of why Plaintiff remained housed in 4D. Plaintiff's counsel can raise these issues with Defendants and Dr. Gafford on cross-examination, and the jury can evaluate the Defendants' testimony without the Board documentation.

*Response* [#418] at 6-10 (internal citations and footnotes omitted).

Although Defendants make several compelling points, the Court notes that the absence of the vast majority of the Review Board records from the applicable period eliminates the best possibility of telling the whole story about why Plaintiff remained in segregation for so many months. It does not take much imagination to envision that the missing records could tell a different story from Defendants' version of events. Without those records, Plaintiff's opportunity to establish and/or contradict Defendants' reasons why he was kept in segregation is diminished. As a result, the Court finds that his ability to

prove the alleged violation of his Constitutional rights has been prejudiced. *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

**C.     Culpability**

As part of its analysis, the Court must consider whether Defendants were culpable in the loss or destruction of evidence. *See Grant*, 505 F.3d at 1032. Defendants concede that the Denver Sheriff Department ("DSD") had a duty to preserve the Board's 2013 records pursuant to its classification policies and to preserve records related to Plaintiff's time in special management pursuant to a 2014 litigation hold from the City Attorney's Office, but they argue that there is no evidence that either Defendant was responsible for the misplacement of the records. *Response* [#418] at 10. At the outset, the Court notes that all sources agree that the hard copy records of the Review Board's written decisions were never entered into the electronic jail management system, despite the DDC policy requirement that this back-up action be taken. *See, e.g.*, *Pl.'s Ex. 2* [#388-1] at 99-100. Thus, although there may be an issue of records mismanagement and failure to follow internal policy, there is not an issue that any such *electronic* records were spoliated by any party or non-party.

From 2014 to June 2017, Defendant Romero was a watch commander in the DDC and the Captain overseeing the Special Management Unit, which included Unit 4D. *Pl.'s Ex. 3* [#388-2] at 11-12. In his deposition taken November 28, 2018, Defendant Romero testified that the Review Board compiled weekly notes of its decisions, that those notes were kept in the sergeant's office, and that he last saw those notes in the sergeant's office in 2013. *Id.* at 155-58.

Defendant Jordan testified that he had custody and control of the relevant Review

Board records until he transferred out of DDC's Special Management Unit in August 2015. *Pl.'s Ex. 2* [#388-1] at 23, 26. In his deposition taken November 27, 2018, he testified that he was very sure in August 2015, when he left DDC's Special Management Unit, that Plaintiff's Review Board records still existed and therefore it must have been at some unknown time after that when they were lost or destroyed. *Id.* at 97, 109. In July 2017 he conducted a thorough search for the records but was unable to find them. *Id.* at 98.

Defendants concede that they "have not learned definitively what may have happened to the Board's 2013 records or precisely when they were misplaced." *Response* [#418] at 11. However, they offer the following theory. Sergeant Garry Tribble ("Tribble) has worked in the Classification unit since 2015. *Decl. of Tribble* [#418-4] ¶ 1. He states that since he started there, the Board's weekly records were kept with other Classification documents "in a drawer in one of three cabinets that were in the Classification office on the third floor of the DDC." *Id.* ¶ 4. When space in the cabinets was needed for newer records, Sgt. Tribble and others moved the records from the drawers into boxes, which were then kept in the storage closet of the Classification office. *Id.* ¶¶ 5, 7. Sgt. Tribble did not recall either Defendant ever participating in this boxing process. *Id.* ¶ 6. When the storage closet became full, a second closet was also utilized to store the boxed records. *Id.* ¶ 7. The boxes were still in the closets when Defendant Romero retired in June 2017. *Id.* ¶ 8. Shortly after that, the new Captain of Classification "directed that the boxes be sent to the Imaging Department to be scanned." *Id.* ¶ 9. After the boxes were removed from Classification, Sgt. Tribble is unaware exactly what happened to them or where they are now. *Id.* Thus, Defendants theorize that the records were lost sometime after they were sent to the Imaging Department. *Response* [#418] at 11. The parties have presented no

evidence regarding whether the relevant records were ever actually scanned by the Imaging Department.

Sgt. Tribble does not recall seeing the specific documents at issue during his time working in Classification, although there is no assertion that he ever looked for these particular documents either. *Id.* ¶ 10. As outlined above, Defendant Romero states that he last saw the records in 2013, but he would have had access to them until June 2017. Defendant Jordan states that he last saw the records in August 2015, which means that he would have had access to the notes from 2013 to August 2015, and then again, if (for the sake of argument) they were there, when he searched for them in July 2017.

Beyond the fact that both Defendants may have had the opportunity to spoliate the relevant records, there is no direct evidence that either one actually did so. There is no evidence from any non-party stating that he or she saw the records at any given point in time. Defendants have provided an alternative explanation for when the records were lost, although there is no evidence conclusively proving that the records were still in the boxes when the boxes were sent to the Imaging Department. It is also troubling that, given the obvious relevance of these documents, Defendants did not take any affirmative step prior to a search in July 2017 to make sure these documents were located and to protect them from loss during the time when Defendants did, in fact, have custody and control over them. *See Cache La Poudre Feeds, LLC,* 244 F.R.D. at 620 (stating that "litigants have a duty to preserve documents that may be relevant to pending or imminent litigation"). In short, though, there is nothing but circumstantial evidence and conflicting explanations for what could have happened to the missing records, including whether one or both of these Defendants may have been culpable in their loss.

**D.     Bad Faith and Sanctions**

At the outset, the Court notes that the Tenth Circuit has recently conceded that "[t]here is some tension in precedents of this court" regarding whether an adverse inference "instruction is proper absent a court finding of bad faith by the party that possessed the records that were lost or destroyed." *E.E.O.C. v. JetStream Ground Servs., Inc.*, 878 F.3d 960, 965 (10th Cir. 2017). "The more recent precedents insist on a finding of bad faith before giving an adverse-inference instruction." *Id.* (citing *Aramburu v. Boeing Co.*, 112 F.3d 1398 (10th Cir. 1997); *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136 (10th Cir. 2009)). "An earlier case, however, suggests that such a finding is unnecessary." *Id.* (citing *Hicks v. Gates Rubber Co.*, 833 F.2d 1406 (10th Cir. 1987)).

Regardless, the Court finds that *Hicks* is distinguishable from the facts of the present case. *See JetStream*, 878 F.3d at 966-67. There, the Circuit Court held that the plaintiff was entitled to a "presumption that the destroyed documents would have bolstered [the plaintiff's] case" because the documents were destroyed in violation of EEOC regulations. *Hicks*, 833 F.2d at 1419. Here, Plaintiff has not demonstrated that the relevant Board Review documents were destroyed by Defendants in violation of DDC policy—in fact, there is no evidence that they have been destroyed by Defendants at all. Rather, the evidence demonstrates only that the documents have been lost. Although the documents may have been destroyed—and if they were destroyed prior to scanning by the Imaging Department, this would likely constitute a violation of DDC policy—there is no clear evidence to that effect before the Court. Accordingly, the Court "compl[ies] with the post-*Hicks* precedents," *see JetStream*, 878 F.3d at 966, and finds that Plaintiff must provide evidence of bad faith to be permitted an adverse inference instruction here.

When, as here, a party has a duty to preserve evidence which is lost or destroyed and the adverse party is prejudiced by its absence, sanctions are appropriate. *Turner*, 563 F.3d at 1149. "If the aggrieved party seeks an adverse inference to remedy the spoliation, it must also prove bad faith." *Id.* "Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a bad case." *Aramburu,* 112 F.3d at 1407.

Plaintiff argues that "Defendants acted with bad faith by intentionally not preserving the Review Board records, trying to cover up their existence, seeking to dismiss Plaintiff's claims on the basis of the Review Board meetings without revealing that the Review Board records had been lost or destroyed, and violating DDC policies and procedures." *Id.* at 9; *see also id.* at 12-13. Defendants argue that, even if Plaintiff could prove culpability, he has not demonstrated bad faith:

> . . . First, . . . the preservation of the documents was beyond the control of either Defendant, and therefore, contrary to Plaintiff's suggestion, neither Defendant is responsible for failing to preserve the DSD's records of the Board's 2013 weekly reviews.
>
> Second, Plaintiff's accusation that Defendants tried to take advantage of Plaintiff when he was pro se by improperly redacting information from DSD policies is wholly unsupported. At the time that Defendants produced DSD policies to Plaintiff, he was a prisoner in the Department of Corrections, making it entirely appropriate for defense counsel to redact the non-public portions of the DSD's internal Post Order from copies sent to Plaintiff. In addition, the timing of Defendants' production of the redacted Post Order does not support Plaintiff's insinuation that counsel acted with a motive to conceal information related to the Board's records. The Defendants produced the redacted copies of the Post Order in August 2016, a year before the 2013 records are believed to have been misplaced in 2017. There was no way of knowing in August 2016 that the 2013 records would be misplaced a year later, and therefore it defies logic that counsel had a motive to hide the existence of documents that, as of then, were likely in the classification office. Furthermore, there was no reason to hide the existence of notes from Plaintiff, who said he had observed Defendants write notes during rounds.

> Third, Plaintiff's allegation that the pleadings drafted by defense counsel in this case somehow constitute a pattern of "hiding the existence of missing records" is untrue and unsupported. Notably, Plaintiff fails to identify any statement in Defendants' pleadings that is false. Contrary to the accusation of engaging in a cover-up, counsel directly informed the Court that the weekly Board reports could not be located after an extensive search. Furthermore, instead of resisting Plaintiff's new counsel's request for un-redacted copies of the Post Order, defense counsel promptly and voluntarily cooperated by agreeing to provide un-redacted documents. These actions are directly at odds with Plaintiff's claim of a "cover up."
>
> Fourth, Defendants' inability to follow a DDC written policy due to technology and staffing limitations does not demonstrate bad faith. The 2013 Packets were stored in paper form. While DDC policy stated the records should also be stored in JMS, the technology was not in place to store the Board's weekly records in the system. Additionally, because the Board was seeing approximately 170 inmates per week, there was not enough staffing to manually input all information from the Board's weekly reviews into JMS. There is no evidence that either Defendant had the authority to implement that process within the DDC despite the policy requirement. Accordingly, there is again no evidence that Defendants acted in bad faith.

*Response* [#418] at 12-14 (internal citations and footnotes omitted). At most, Defendants assert that the Court should allow presentation of the evidence that Defendants failed to preserve the Review Board records and allow the parties to argue for whatever inference they believe is appropriate by the trier of fact. *Response* [#387] at 39.

As noted above, the determination of proper sanctions turns on the culpability of Defendants' alleged conduct. After a full review, the Court notes that the evidence presented is consistent with bungled record-keeping, bungled records management, and extreme carelessness, but the Court cannot find that Plaintiff has met his burden of proving that the evidence is consistent with bad faith. Taken as a whole, the evidence paints a portrait of ineptitude, not malfeasance. An adverse inference instruction is appropriate only if the Court finds that the moving party has shown that the party who lost or destroyed the evidence did so intentionally or in bad faith, because "[m]ere negligence in losing or

destroying records is not enough." *Turner*, 563 F.3d at 1149 (quoting *Aramburu*, 112 F.3d at 1407). Although it is *possible* that Defendants may have contributed to the loss or destruction of the Review Board records, the evidence demonstrates that it is *probable* on this record that other employees at DDC, which is not a defendant in this action, caused their loss or destruction. Thus, the Court declines to find that the severe sanctions sought by Plaintiff in this case should be imposed:

> Judges must be careful to tailor the remedy to the problem, and 'take pains neither to use an elephant gun to slay a mouse nor to wield a cardboard sword if a dragon looms.' The sanction to be applied needs to be one which is appropriate to the truth-finding process, not one that serves only further to suppress evidence . . . . Sanctions which preclude the admission of certain evidence or provide for a negative inference in the place of destroyed evidence operate in the same fashion as a default judgment. They intrude into the 'truth-finding process' of a trial, and represent 'grave steps' for a trial judge to take. Such sanctions should be considered with very great restraint.

*Gates Rubber Co.*, 167 F.R.D. at 106-07 (citations omitted). Although it is apparent that the relevant Review Board records existed, that most of them have been lost or destroyed, and that Plaintiff has been prejudiced, the Court does not find that Plaintiff has sustained his burden of demonstrating that Defendants were culpable and acted in bad faith. *Turner*, 563 F.3d at 1149.

Nevertheless, some sanction is appropriate due to the apparently negligent spoliation of evidence demonstrated here and the facts that the relevant records were indeed in the custody and control of Defendants for varying periods after this litigation began and that some affirmative steps should have been taken at that time for their preservation. Accordingly, the Court **recommends** that the Motion [#387] be **granted in part** to the extent that the parties be permitted to present evidence relating to the lost or destroyed Review Board records and to argue whatever inferences they hope the jury will

draw from their absence.

### III. Conclusion

For the reasons discussed above,

IT IS HEREBY **RECOMMENDED** that the Motion [#387] be **GRANTED in part**, to the extent that the parties be permitted to present evidence relating to the lost or destroyed Review Board records and to argue whatever inferences they hope the jury will draw from their absence.

IT IS FURTHER **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996). A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review. *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated: January 10, 2019

BY THE COURT:

Kristen L. Mix
United States Magistrate Judge