IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 14-cv-02406-PAB-KLM

FRANKY L. SESSION,

      Plaintiff,

v.

DEPUTY SHERIFF CAPTAIN ROMERO, in his individual capacity, and
DEPUTY SHERIFF SERGEANT JORDAN, in his individual capacity,

      Defendants.
_____

**ORDER**
_____

      This matter comes before the Court on Plaintiff's Motion to Strike Defendants'

Expert's Report and in the Alternative Exclude Portions Thereof [Docket No. 392],

Defendants' Fed. R. Evid. 702 Motion to Exclude Expert Testimony of David Teigen

[Docket No. 393], and Plaintiff's Motion for Leave to Serve a Supplemental Expert

Report [Docket No. 405]. This case is set for a four-day jury trial beginning on January

28, 2019. Docket No. 359. Plaintiff alleges that defendants, who are deputies from the

Denver Sheriff's Department, violated his Fourteenth Amendment due process rights by

keeping him in a 23-hour per day segregation unit at Denver Detention Center ("DDC"),

which is operated by the Denver Sheriff's Department, from March 24, 2013 to

December 18, 2013. Docket No. 300 at 2.

## I. MOTION TO EXCLUDE UNDER FED. R. EVID. 702

### A. Legal Standard

      The admissibility of expert testimony is governed by Federal Rule of Evidence

702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As the rule makes clear, while required, it is not sufficient that an expert be qualified based upon knowledge, skill, experience, training, or education to give opinions in a particular subject area. Instead, the Court must "perform[] a two-step analysis." *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006). After determining whether the expert is qualified, the Court must assess whether the specific proffered opinions are reliable. *See id.*; Fed. R. Evid. 702 (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods to the facts of the case").

Rule 702 thus imposes on the district court a "gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). To perform this role, the Court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93). In assessing reliability, "the court may consider several

nondispositive factors: (1) whether the proffered theory can and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community." *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006). These factors are not applicable in every case. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 150-53 (1999). Indeed, the trial court has "the same kind of latitude in deciding *how* to test an expert's reliability . . . as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable." *Id.* at 152. Regardless of the specific factors applied, however, the objective of *Daubert*'s gatekeeping requirement remains the same: to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*

Although the proponent of the challenged testimony has the burden of establishing admissibility, *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (citing *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001)), the reliability standard does not require proof "that the opinion is objectively correct, but only that the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008) (internal citation omitted).

Assuming the standard for reliability is met, the Court must also ensure that the proffered testimony will assist the trier of fact. *See Kumho Tire*, 526 U.S. at 156; *United*

*States v. Rodriguez-Felix*, 450 F.3d 1117, 1122-23 (10th Cir. 2006).  "Relevant expert

testimony must logically advance[ ] a material aspect of the case and be sufficiently tied

to the facts of the case that it will aid the jury in resolving a factual dispute." *United*

*States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (internal quotation marks and

citations omitted).  In assessing whether expert testimony will assist the trier of fact, the

Court should also consider "whether the testimony 'is within the juror's common

knowledge and experience,' and 'whether it will usurp the juror's role of evaluating a

witness's credibility.'"  *Id.* at 476-77 (quoting *Rodriguez-Felix*, 450 F.3d at 1123).

**B.  Analysis**

Plaintiff has designated David Teigen as an expert in the field of corrections.  Mr.

Teigen's expert report includes five opinions that plaintiff anticipates offering at trial:

> 1.  Under generally accepted correctional industry standards, an inmate shall only be placed in segregation for a jail management rationale relating to a threat to life, property, self, staff, community, other inmate, or to the security and orderly operation of the institution.

> 2.  Under generally accepted correctional industry standards, the reason for placing or holding an inmate in segregation should be supported by clear and substantiated evidence and fully documented.

> 3.  Under generally accepted correctional industry standards, an inmate in segregation should receive a review of his classification within a timely manner from the appropriate authority and in regular intervals until the inmate is released from segregation.

> 4.  Based on my review of the record, Defendants have not provided a sufficient jail management rationale for keeping Mr. Session in segregation for the period between approximately March 31 and December 18, 2013.

> 5.  Based on my review of the record, Defendants did not support

> their supposed rationale for keeping Mr. Session in segregation
> with sufficient evidence or documentation, as would be expected of
> them on a regular basis under industry standards.

Docket No. 393-1. Defendants seek to exclude each of these opinions on the grounds that (1) Mr. Teigen is not qualified to opine on the standards and policies applicable to a county-level detention center, like DDC; (2) Mr. Teigen's reliance on Colorado Department of Corrections ("CDOC") and Bureau of Prisons ("BOP") policies and regulations renders his opinions unreliable; and (3) Mr. Teigen's opinions regarding the policies and practices of DDC are not relevant to plaintiff's individual-capacity claims in this case. *See generally* Docket No. 393.

### 1. Qualifications and Reliability

Defendants argue that Mr. Teigen lacks the requisite qualifications to opine on the standards and policies applicable to DDC, which is a jail housing pretrial detainees, because his only experience is with state-operated prisons. Docket No. 393 at 4-5. Defendants state that county jails are different from state prisons because (1) prisons are operated under the authority and supervision of the Executive Director of the CDOC; (2) the population housed in county jails is more diverse than the inmate population in state prisons; and (3) the jail population is more transient, meaning that jail officials have more limited information about detainees than officials in state facilities. *Id.* at 5-6. Plaintiff responds that Mr. Teigen is qualified to opine on the standards applicable to the DDC based on his "extensive training and professional experience in the field of corrections generally, and the classification of inmates and use of segregation and protective custody specifically." Docket No. 406 at 5. Plaintiff contends that the American Correctional Association, whose standards Mr. Teigen cites

in his expert report, establishes "best practices for the entire corrections field." *Id.* According to plaintiff, the differences defendants identify between jails and prisons are not relevant to the opinions expressed in Mr. Teigen's expert report. *Id.* In their reply, defendants reiterate the unique, "dynamic nature of a jail's population" and note that the use of force is governed by a different legal standard when applied to pretrial detainees rather than convicted prisoners. Docket No. 425 at 2.

Mr. Teigen has thirty years of experience in the corrections field. Docket No. 406 at 2; Docket No. 393-2 at 1. He has served in a variety of roles within the state corrections industry, including Administrative Services Manager, Security Manager, Case Manager Supervisor, Administrative Hearings Officer, and Co-Chair of the Colorado Department of Corrections Classification Task Force. Docket No. 393-1 at 2, ¶ 7. Many of these positions involved management and oversight of staff training, policy development, offender classification, and administrative segregation. *See* Docket No. 393-2 at 2-3. Early in his career, Mr. Teigen served on the classification committee at Colorado State Penitentiary and was "responsible for administrative reviews, administrative hearings, conditions of confinement, and case management." Docket No. 393-1 at 3, ¶ 10. Since that time, he has supervised segregation units at multiple state facilities and led trainings in the areas of litigation, policy development, offender discipline, classification, case management, and offender movement. *Id.*, ¶ 12.

Based on Mr. Teigen's extensive experience in the field of corrections, the Court finds he is qualified to opine on the standards governing offender classification at DDC and whether defendants complied with those standards. Defendants argue that Mr.

Teigen lacks sufficient knowledge of the standards applicable to DDC because he has never worked in a county jail. But while defendants identify various differences between jails and prisons, none of those differences are relevant to Mr. Teigen's opinions. *Cf. DeBuhr v. Hern*, No. 15-cv-02613-PAB-MEH, 2017 WL 4297345, at *4 (D. Colo. Sept. 27, 2017) (rejecting argument that expert was not qualified to opine on standard of care where opinions did not depend on the alleged lack of experience); *DuBois v. Bd. of Cty. Comm'rs of Mayes Cty.*, 2016 WL 907971, at *2 (N.D. Okla. Mar. 9, 2016) (declining to exclude expert testimony on correctional policies and procedures where defendants failed to "adequately explain how any standards applicable to th[e] case ha[d] changed in time since [the expert] retired in 2009"); *McCloud ex rel. Hall v. Goodyear Dunlop Tires N. Am., Ltd.*, 479 F. Supp. 2d 882, 888 (C.D. Ill. 2007) (rejecting argument that, because experts did not have experience with motorcycle tires, they were not qualified to render an expert opinion in case, where defendant filed to "identify any relevant differences between motorcycle and passenger vehicle tires"). As plaintiff argues, the industry standards applicable to county-level detention centers do not differ in any meaningful way from the standards cited in Mr. Teigen's expert report. *See* Docket No. 406. And the one potentially significant difference that defendants do highlight – i.e., that the use of force on pretrial detainees is governed by a different legal standard than the use of force in the prison context, *see* Docket No. 425 at 2 – has no bearing on any of the opinions expressed in Mr. Teigen's report.[1]

---

[1]Defendants suggest that the use of force issue relates to Mr. Teigen's assertion that defendants "should have physically forced Plaintiff from his cell in 4D and moved him to 4A." Docket No. 425 at 2. However, this opinion appears nowhere in Mr. Teigen's report. Defendants appear to extrapolate the opinion from Mr. Teigen's

For similar reasons, the Court rejects defendants' argument that Mr. Teigen's opinions are unreliable. Defendants argue that Mr. Teigen's opinions are based on a flawed methodology because they rely on standards inapplicable to the DDC. Specifically, defendants assert that the American Correctional Association's Performance Based Standards for Adult Local Detention Facilities ("ALDF Standards") govern the DDC, whereas the ACA standards relied upon in Mr. Teigen's expert report – the ACA's Standards for Adult Correctional Institutions ("ACI Standards") – apply only to state prison facilities. *See* Docket No. 393 at 7-8. The Court finds defendants' argument unpersuasive. Mr. Teigen's report draws from various sets of standards, including the DDC's own policies and procedures, to demonstrate uniformity within the corrections field. *See, e.g.*, Docket No. 393-1 at 5-8, ¶¶ 24 (stating that opinion is based on his "review and knowledge of ACA, state, federal, and DDC standards, policies, and procedures"), 34 (citing ACA, CDOC, and Federal Bureau of Prisons standards), 35 (explaining how the DDC's own policies and procedures are "in line" with standards applicable to other types of facilities), and 40 (stating that the need for documentation is "uniformly recognized by the correctional industry, including in ACA, CDOC, FBOP, and DDC standards, policies, and procedures"); *see also* Docket No. 406 (explaining that Mr. Teigen is not claiming "that the DDC is bound by CDOC or

---

statement that "a pre-trial detainee's own housing preference is not considered an accepted reason to keep an inmate in segregation." Docket No. 393-1 at 10, ¶ 56. But defendants' speculation as to how Mr. Teigen might respond to the opinions of their rebuttal expert, Shawn Laughlin, *see* Docket No. 392-2 at 18-19 (opining that defendants' decision to allow plaintiff to remain in Unit 4D was the "path that didn't force a physical confrontation" between plaintiff and DSC), is not a sufficient basis on which to exclude Mr. Teigen's testimony.

FBOP standards," but that "there are generally accepted standards applicable across all levels of the corrections industry, which is clear from the fact that all the policies and standards he analyzes . . . are aligned" on the issues addressed in his report). To the extent that defendants believe Mr. Teigen should have relied exclusively on the ALDF Standards, they have failed to identify any relevant differences between those standards and the regulations cited in Mr. Teigen's report.

Defendants' citation to *White v. Deere & Co.*, No. 13-cv-02173-PAB-NYW, 2016 WL 482712 (D. Colo. Feb. 8, 2016), is inapposite. While this Court in *White* noted that "[a]n expert's failure to take into account the relevant industry standards weighs against the reliability" of his opinions, *White*, 2016 WL 482712, at *4, the proponent of the expert testimony in that case failed to respond to many of the arguments raised in the defendant's Rule 702 motion. *Id.* at *3. To the extent the arguments were addressed, the expert failed to demonstrate that the industry standards relied upon were actually relevant to the issues in the case. *See, e.g.*, *id.* (finding that a manufacturer cannot violate "an industry standard if that standard is no longer in effect"). Here, plaintiff has not only explained Mr. Teigen's purpose in relying on correctional standards applicable to different types of facilities, but he has also shown, through concrete examples, that there is uniformity among those standards. *See* Docket No. 406 at 8-9 (comparing the ACI and ALDF standards); *see also* Docket No. 393-1 at 7-9, ¶¶ 35, 44, 52 (explaining how DDC's policies and procedures are similar to other correctional guidelines). Therefore, the general proposition defendants rely upon from *White* does not warrant the exclusion of Mr. Teigen's testimony.

Defendants also argue that opinions 2 through 5 are unreliable because Mr. Teigen does not provide any support for his conclusions. *See* Docket No. 393 at 11-15. It is evident from Mr. Teigen's report, however, that he is relying on his extensive experience and training in the corrections field as a basis for his opinions. This is proper, so long as Mr. Teigen can explain "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Fredette*, 315 F.3d 1235, 1240 (10th Cir. 2003) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments); *cf. O'Sullivan v. Geico Cas. Co.*, 233 F. Supp. 3d 917, 925 (D. Colo. 2017) (finding expert's methodology, which consisted of "explaining what he [knew] of insurance industry standards and practices based on his experience, explaining the facts and evidence he reviewed in this case, then opining on the ways he believe[d] Geico's handling of Plaintiff's claim fell short [of] the relevant industry standards," to be "sufficiently reliable" under Rule 702). The Court finds that Mr. Teigen satisfies these requirements. Read as a whole, his report demonstrates that his experience is a sufficient basis for his conclusions and that he has reliably applied that experience to the facts of this case. *See Fredette*, 315 F.3d at 1240.

### 2. Relevance and Ultimate Issue Testimony

Defendants also move to exclude Mr. Teigen's opinions on the basis of relevance. *See* Docket No. 393 at 9, 11-12, 15. Specifically, defendants argue that opinions 1-3 and 5 lack the requisite "fit" to the issues in this case. *See id.*

The Court disagrees with respect to opinions 1 and 3. Defendants claim that

these opinions, which relate to "generally accepted correctional industry standards," Docket No. 393-1 at 5, 8, are not relevant to the individual-capacity claims asserted in this case. Docket No. 393 at 9-10. They further argue that failure to comply with a department policy or procedure does not amount to a *per se* constitutional violation. Docket No. 393 at 9. Although defendants are correct on the latter point, courts in constitutional tort cases have recognized that "[e]xpert testimony regarding relevant professional standards can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights." *Jimenez v. City of Chicago*, 732 F.3d 710, 721-22 (7th Cir. 2013); *see also Murphy v. City of Tulsa*, 2018 WL 468286, at *4 (N.D. Okla. Jan. 18, 2018) (collecting cases finding that expert testimony on "professional standards can be relevant and helpful" in constitutional tort cases); *cf. Brown v. Plata*, 563 U.S. 493, 539-40 (2011) (noting that, although "courts must not confuse professional standards with constitutional requirements[,] . . . expert opinion [on professional standards] may be relevant when determining what is obtainable and what is acceptable in corrections philosophy"). Such is the case here. As plaintiff argues, "[t]estimony about the generally accepted and legitimate uses of segregation will assist the jury in determining whether Defendants had a legitimate reason to hold Plaintiff in segregation for more than eight-and-a-half months." Docket No. 406 at 10. Mr. Teigen's testimony is therefore relevant to the issues in this case.

The Court reaches a different conclusion as to opinions 2 and 5. In opinion 2,

Mr. Teigen states that generally accepted correctional industry standards require an inmate's segregation to be "fully documented." Docket No. 393-1 at 7, ¶ 36. He similarly concludes in opinion 5 that defendants "did not support their supposed rationale for keeping Mr. Session in segregation with sufficient evidence or documentation." Docket No. 393-1 at 10, ¶ 58. The final pretrial order, which merges the pleadings in this case, Docket No. 300 at 6-7, does not state a claim based on, or even mention, defendants' failure to document the reasons for plaintiff's segregation. *See id.* at 2-3; *see also Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1304 (10th Cir. 2003) (stating that the "pretrial order measures the dimensions of the lawsuit, both in the trial court and on appeal" (internal quotation marks omitted); *see also* Fed. R. Civ. P. 16(d) (stating that the pretrial order "controls the course of the action unless the court modifies it"). Mr. Teigen's opinions regarding defendants' compliance with record-keeping standards have no direct bearing on the claim in this case. And plaintiff does not explain why the jury's understanding of record-keeping standards would inform its view of whether a constitutional violation concerning plaintiff's prolonged detention in Unit 4D occurred.[2] Although Mr. Teigen argues that documentation requirements

---

[2]The Court recognizes that defendants' failure to comply with documentation requirements may be relevant to the issue of spoliation. *See* Docket No. 427 at 15-16 (recommending that the Court allow the parties to "present evidence relating to the lost or destroyed Review Board records and to argue whatever inferences they hope the jury will draw from their absence"). However, plaintiff does not need expert testimony on generally accepted corrections standards to show that relevant evidence was lost or destroyed in this case. Given this fact, the Court finds that the probative value of Mr. Teigen's opinions on the adequacy of defendants' documentation is substantially outweighed by the risk of unfair prejudice and jury confusion – specifically, the risk that the jury will equate defendants' alleged failure to abide by documentation standards with a violation of plaintiff's Fourteenth Amendment rights. *See* Fed. R. Evid. 403.

protect against a "bad apple" keeping an inmate in solitary detention inappropriately, he does not claim that "bad apples" were involved in this case. The Court will exclude opinion 5 in its entirety, as well as that portion of opinion 2 in which Mr. Teigen states that the reason for placing or holding an inmate in segregation should be "fully documented." The remainder of opinion 2 will be admitted.

Finally, defendants move to exclude the following statement, in opinion 4, as usurping the function of the jury: "[w]ithout having investigated Mr. Session's perceived conflicts, and concluded they gave rise to legitimate safety or security concerns that could not be remedied through other means, Defendants did not have cause to hold Mr. Session in segregation." Docket No. 393-1 at 10; *see also* Docket No. 393 at 13-14. Defendants argue that this statement informs the jury, "without support, that Defendants concluded that Plaintiff's perceived conflicts with other inmates implicated no legitimate safety or security concerns that warranted keeping him in segregation." Docket No. 393 at 14.

The Court disagrees. First, defendants appear to misread Mr. Teigen's opinion. As the Court understands his report, he is not saying that defendants *actually* concluded plaintiff's conflicts with other inmates did not implicate legitimate safety or security concerns. Instead, he is criticizing defendants' failure to investigate the perceived conflicts and reach an informed decision, one way or the other, on the issue. Second, Mr. Teigen has provided an adequate explanation of the criteria on which his opinion is based. *See United States v. Richter*, 796 F.3d 1173, 1195-96 (10th Cir. 2015) (explaining that the line between permissible and impermissible expert testimony depends on whether the expert has provided "any explanation of the criteria on which

[his] opinion is based" (internal quotation marks omitted)).  In the paragraph containing the challenged statement, Mr. Teigen acknowledges that "[c]onflicts with other inmates could be a legitimate reason for segregation," but states that his review of the evidence did not show defendants adequately investigated "whether the inmates Mr. Session had perceived conflicts with were still housed in Unit 4A, whether those inmates could be transferred to other areas, or whether the perceived conflicts had any basis in reality." Docket No. 393-1 at 10, ¶ 57.  This explanation provides the jurors with appropriate factors for them to evaluate Mr. Teigen's opinion by reaching their own conclusions as to the evidence.  Mr. Teigen's opinion therefore does not usurp the jury's function.

## II.  MOTION TO STRIKE

Plaintiff moves to strike the testimony of defendants' rebuttal expert, Shawn Laughlin, on the ground that his opinions exceed the scope of proper rebuttal testimony and defendants did not seek leave to designate an affirmative expert in this case.  *See* Docket No. 392.  In support of his motion, plaintiff argues that Mr. Laughlin's report does not "mention Teigen's report or provide opinions that contradict or rebut" his proposed testimony.  *Id.* at 3.  Defendants respond that, although Mr. Laughlin "does not directly mention Teigen," his opinions rebut the methodology, factual assumptions, and substantive conclusions outlined in Mr. Teigen's expert report.  *See* Docket No. 411 at 3-7.

Affirmative expert testimony "serves to establish a party's case-in-chief," *Spring Creek Exploration & Prod. Co., LLC v. Hess Bakken Investment II, LLC*, No. 14-cv-00134-PAB-KMT, 2016 WL 1597529, at *3 (D. Colo. Apr. 21, 2016).  In contrast,

rebuttal expert testimony is "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). Rebuttal experts are not permitted to "put forth their own theories; they must restrict their testimony to attacking the theories offered by the adversary's experts." *Spring Creek Exploration & Prod. Co., LLC*, 2016 WL 1597529, at *3 (internal quotation marks omitted). When expert reports "simply address the same general subject matter as a previously-submitted report, but do not directly contradict or rebut the actual contents of that prior report," they "do not qualify as proper rebuttal or reply reports." *Id.* (internal quotation marks omitted); *see also Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006) ("The function of rebuttal testimony is to explain, repel, counteract or disprove the evidence of the adverse party."); *Bone Care Int'l, LLC v. Pentech Pharmaceuticals, Inc.*, 2010 WL 3894444, at *15 (N.D. Ill. Sept. 30, 2010) (explaining that expert rebuttal reports "are by nature responsive, and necessitate a showing of facts supporting the opposite conclusion of those at which the opposing party's experts arrived" (internal quotation marks omitted)).

Mr. Laughlin's twenty-page report bears none of the hallmarks of proper rebuttal testimony. It does not (1) refer to Mr. Teigen, (2) refer to Mr. Teigen's report, (3) state that its purpose is to rebut Mr. Teigen's report, or (4) discuss any of Mr. Teigen's stated opinions, which are clearly identified in Mr. Teigen's report.[3] Mr. Teigen's report is also not listed among the materials reviewed by Mr. Laughlin in preparing his report. *See*

---

[3]The closest Mr. Laughlin comes to citing Mr. Teigen's opinions directly is his statement, on page twenty of the report, that "Plaintiff's application of correctional standards and best practices intended for state and federal prisons is improper." Docket No. 392-2 at 20.

Docket No. 392-2 at 22-23.  While Mr. Laughlin's report addresses the same general topic as Mr. Teigen's – namely, whether defendants had a legitimate reason for keeping plaintiff in administrative segregation – Mr. Laughlin's treatment of that topic far exceeds the scope of Mr. Teigen's report.

In their response, defendants identify three aspects of Mr. Laughlin's report which, they contend, directly contradict Mr. Teigen's substantive conclusions and methodology: (1) Mr. Laughlin's opinion that it is improper to apply prison standards to a county facility; (2) his opinion that plaintiff was kept in Unit 4D because of the nature of his criminal charges and the risks of forcibly removing plaintiff from his cell; and (3) his opinion that available Administrative Review Board records support defendants' decision to keep plaintiff in Unit 4D.  *See* Docket No. 411 at 4-7.  Only the first two of these opinions are at issue, given that the third is being offered to rebut expert testimony (Mr. Teigen's opinion 5) that has already been excluded under Fed. R. Evid. 702.

As to the remaining opinions, the Court agrees with plaintiff that they exceed the bounds of proper rebuttal testimony.  Although Mr. Laughlin's opinion that it is improper to apply prison standards to county-level facilities calls into question Mr. Teigen's reliance on "generally accepted correctional industry standards," Mr. Laughlin does not explain how his view of the applicable standards undermines any of the conclusions reached in Mr. Teigen's report.  *See* Docket No. 392-2 at 6-7.  Because Mr. Laughlin's opinion does not "directly contradict or rebut the actual contents" of Mr. Teigen's report, *Spring Creek Exploration & Prod. Co., LLC*,  2016 WL 1597529, at *3 (internal quotation marks omitted), it does not constitute proper rebuttal under Fed. R. Civ. P.

26(a)(2).

The same is true of Mr. Laughlin's second opinion. Defendants argue that Mr. Laughlin's report rebuts Mr. Teigen's "factual assumption . . . that the only reason that Plaintiff was housed in Unit 4D was his 'own wishes.'" Docket No. 411 at 6. According to defendants, Mr. Laughlin's report does this in two ways: (1) by noting that plaintiff was held in Unit 4D because his pending criminal charges put him at risk of sexual assault; and (2) by explaining that forcing plaintiff to leave Unit 4D against his wishes could have resulted in an unnecessary physical altercation between plaintiff and jail staff. Docket No. 411 at 6-7. As to the first point, however, Mr. Teigen never asserts that defendants should have placed plaintiff back in general population. The question addressed in opinion 4 is whether defendants had a legitimate reason for not returning plaintiff to Unit 4A. *See* Docket No. 393-1 at 9-10 (discussing lack of documentation that "there was any threat to Mr. Session or others if Mr. Session was permitted to return to Unit 4A"). The portions of Mr. Laughlin's report cited by defendants, Docket No. 392-1 at 11, 13, 19, are not responsive to Mr. Teigen's opinions on this issue.[4]

With regard to defendants' second point, the Court finds Mr. Laughlin's statements regarding the "high likelihood of a use of force incident," Docket No. 392-2 at 18, to be too far afield of Mr. Teigen's opinions to constitute proper rebuttal testimony. There is no indication in Mr. Teigen's report that he reviewed evidence or formulated an opinion regarding the possibility of a physical confrontation between

---

[4]In asserting this argument, defendants effectively ask the Court to match scattered portions of Mr. Laughlin's report to Mr. Teigen's opinions, even though Mr. Laughlin never draws this connection himself. Such an exercise, by its nature, demonstrates that Mr. Laughlin's report is not a rebuttal report.

plaintiff and defendants.  *See* Docket No. 393-1 at 10, ¶ 56 (stating that "[t]he only reason Defendants have offered for keeping Mr. Session in segregation is his own wishes").  Thus, rather than "poke holes" in Mr. Teigen's report, Mr. Laughlin is giving opinions on new topics that plaintiff would ordinarily be entitled to rebut.  *See Spring Creek Exploration & Prod. Co., LLC*, 2016 WL 1597529, at *6 (explaining that "the relevant inquiry is whether a responding expert witness limits himself to 'poking holes' in the Plaintiffs' expert report, or whether the Defendants' experts are, perhaps in addition to 'poking holes,' offering new theories or addressing topics not directly presented in Plaintiffs' original experts' opinions").  For this reason, Mr. Laughlin's opinions exceed the scope of proper rebuttal testimony.[5]

Evidence that is improperly disclosed under Fed. R. Civ. P. 26(a) is subject to exclusion under Fed. R. Civ. P. 37(c)(1) unless the error "was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  In making this determination, courts in this Circuit consider four factors: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad

_____

[5]The distinction between affirmative expert testimony and rebuttal testimony is important.  The original deadline for affirmative expert disclosures was November 1, 2016.  Docket No. 168.  Neither party designated an affirmative expert by that date. Docket No. 300 at 5.  On September 28, 2018, plaintiff, through newly-appointed counsel, filed a motion requesting that the Court modify the scheduling order to allow plaintiff to conduct additional discovery and designate an affirmative expert witness. Docket No. 364.  On November 9, 2018, the Court granted plaintiff's motion in part and ordered plaintiff to disclose to defendants his affirmative expert designation and accompanying report within twenty days.  Docket No. 376 at 15.  Defendants were given an additional fourteen days from the receipt of plaintiff's expert disclosure to designate a rebuttal expert.  *Id.*  Unlike plaintiff, defendants never sought leave to designate an affirmative expert.

18

faith or willfulness." *Woodworker's Supply, Inc. v. Principal Mutual Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999). Neither party addresses these factors. Nonetheless, the Court finds that the first three factors clearly weigh in favor of exclusion. Because trial is two weeks away, plaintiff does not have a reasonable opportunity to prepare a rebuttal report or otherwise attempt to cure the prejudice that would result if Mr. Laughlin's testimony were introduced at trial. Moreover, any last-minute efforts at additional discovery would disrupt the trial. The Court will therefore strike, in its entirety, Mr. Laughlin's report, which is not "intended solely to contradict or rebut evidence on the same subject matter identified by" plaintiff. Fed. R. Civ. P. 26(a)(2)(D)(ii).[6]

## III. MOTION TO SUPPLEMENT

Plaintiff moves to supplement Mr. Teigen's initial report with opinions highlighting the similarities between various ACI and ALDF Standards. *See* Docket No. 405; Docket No. 405-1 (supplemental report). Plaintiff argues that good cause exists to allow him to submit the supplemental report because the new ALDF Standards cited in that report "are materially the same as the more general ACI Standards relied upon by Mr. Teigen in his initial report." Docket No. 405 at 2. Defendants respond that the "proposed supplement exceeds the bounds of permissible supplementation under Fed. R. Civ. P. 26," and that granting plaintiff's request "little more than two weeks before trial will severely prejudice Defendants." Docket No. 422 at 1.

---

[6]Defendants provide no argument regarding those sections of Mr. Laughlin's report that are not addressed in this order. Accordingly, those portions will also be stricken. Because the Court strikes Mr. Laughlin's report in its entirety, the Court need not address whether his opinions are admissible under Fed. R. Evid. 702. That portion of plaintiff's motion is denied as moot.

Federal Rule of Civil Procedure 26(e)(1)(A) permits a party to supplement an expert report "in a timely manner if the party learns that in some material respect" the original report was "incomplete or incorrect." "This provision is not intended to provide an extension of the expert designation and report production deadlines." *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1169 (D. Colo. 2006) (internal quotation marks omitted). Instead, it is to be used for purposes of "correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Id.* (internal quotation marks omitted).

The Court agrees with defendants that plaintiff's proffered report exceeds the bounds of proper supplementation under Fed. R. Civ. P. 26(e)(1). It does not purport to correct any inaccuracies in Mr. Teigen's initial report or to fill in holes "based on information that was not available at the time of the initial disclosure." *Cook*, 580 F. Supp. 2d at 1169. Indeed, plaintiff's stated purpose in seeking to supplement Mr. Teigen's initial report is to strengthen the basis for his opinions in response to defendants' motion to exclude. *See* Docket No. 405 at 2, ¶ 6 (stating that the supplement "responds to Defendants' argument made in its motion filed on December 27, 2018"). This is an improper use of supplementation under Fed. R. Civ. P. 26(e)(1). *See Cook*, 580 F. Supp. 2d at 1169 (explaining that a "supplemental report that states additional opinions or rationales or seeks to 'strengthen' or 'deepen' opinions expressed in the original expert report exceeds the bounds of permissible supplementation").

Because the tendered report is not a proper supplement under Fed. R. Civ. P. 26(e)(1), it is subject to exclusion under Rule 37(c). As noted above, the Court must

weigh the *Woodworker's Supply* factors to determine whether plaintiff's failure to disclose the additional opinions by the applicable deadline was substantially justified or harmless. Plaintiff argues that defendants will not be prejudiced by the supplemental report because it merely responds to the arguments raised in defendants' Rule 702 motion and defendants have not deposed Mr. Teigen. Docket No. 405 at 2-3. Plaintiff does not explain why the new opinions were not included in Mr. Teigen's initial report, other than to assert that there are no relevant differences between the ACI Standards and the ALDF Standards. *Id.* at 2.

Defendants contend that they would be unduly prejudiced by the admission of the supplemental report because their deadline to respond to plaintiff's motion was the same day as their deadline to reply in support of their Rule 702 motion. As such, defendants did not have the opportunity to address Mr. Teigen's new opinions in the Rule 702 briefing. *See* Docket No. 422 at 4-5. Defendants also state that they have been unable to prepare a rebuttal to the supplement in light of "five other intervening deadlines in this case and a fact discovery deposition." Docket No. 422 at 5 n.1.

The Court finds that the *Woodworker's Supply* factors weigh in favor of exclusion. Defendants are entitled to an opportunity to rebut new expert opinions, even if those opinions respond to arguments already raised in defendants' Rule 702 motion. If anything, this factor makes it even more imperative that defendants be given a chance to respond. However, given the imminent trial date, as well as the numerous, expedited deadlines for discovery and trial-related briefing that have been set in this case, the Court does not think it fair or reasonable to require defendants to assume the

additional task of responding to opinions that could have been disclosed earlier.
Because any further, expert-related discovery would be prejudicial and disruptive to the
parties' efforts to prepare for the upcoming trial, the Court will deny plaintiff's motion to
supplement Mr. Teigen's expert report.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendants' Fed. R. Evid. 702 Motion to Exclude Expert
Testimony of David Teigen [Docket No. 393] is **GRANTED** in part and **DENIED** in part
as stated in this order.  It is further

**ORDERED** that Plaintiff's Motion to Strike Defendants' Expert Report and in the
Alternative Exclude Portions Thereof [Docket No. 392] is **GRANTED** in part and
**DENIED** in part as stated in this order.  It is further

**ORDERED** that Plaintiff's Motion for Leave to Serve a Supplemental Expert
Report [Docket No. 405] is **DENIED**.

DATED January 14, 2019.

BY THE COURT:

 s/Philip A. Brimmer                                    
PHILIP A. BRIMMER
United States District Judge